UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARY WALSH and | ) | |
| BEVERLY NANCE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-cv-1222 |
| | ) | |
| FRIENDSHIP VILLAGE OF SOUTH | ) | |
| COUNTY d/b/a FRIENDSHIP VILLAGE | ) | |
| SUNSET HILLS and | ) | |
| FV SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants Friendship Village of South County d/b/a Friendship Village Sunset Hills ("Friendship Village" or "Defendant Friendship Village") and FV Services, Inc. ("FV Services" or "Defendant FV Services") (collectively, "Defendants"), by and through their attorneys, file this Memorandum in Support of their Motion for Judgment on the Pleadings.

## INTRODUCTION & BACKGROUND

Plaintiffs Mary Walsh and Beverly Nance (collectively, "Plaintiffs") initiated this lawsuit on July 25, 2018, when they filed their Complaint with the Court.  *See* Plaintiffs' Complaint ("Complaint").  In their Complaint, Plaintiffs bring claims of alleged housing discrimination under both the Fair Housing Act ("FHA") and the Missouri Human Rights Act ("MHRA") against Defendant Friendship Village and Defendant FV Services.  *See generally*, Complaint. Specifically, Plaintiffs allege that particular acts and omissions of Defendant Friendship Village in 2016 constitute sex discrimination in violation of the FHA and MHRA.  *Id.*  In particular, the Complaint alleges both:  (1) discriminatory refusal to negotiate for the sale or rental of a

dwelling unit at Friendship Village; and (2) discriminatory notices and/or statements with respect to the sale or rental of a dwelling.[1]  *See* Complaint at ¶¶ 75-89.  At the time of the alleged wrongdoing referenced in the Complaint, FV Services did not exist, as it did not come into existence until March 2017.  *See* Defendants' Answer ("Answer") at ¶¶ 5, 27; Exhibit A to Answer.

Prior to filing this lawsuit, Plaintiffs filed a housing discrimination complaint in October 2016 that was dual-filed with both the federal Department of Housing and Urban Development ("HUD") and the Missouri Commission on Human Rights ("MCHR").  *See* Answer at ¶¶ 60, 82; Exhibit B to Answer.  That complaint – which named Friendship Village, Carmen Walker, and Michael Heselbarth as respondents – only alleged "discriminatory refusal to rent" on the basis of sex and religion.  *See* Answer at ¶ 60; Exhibit B to Answer.  The MCHR – in a letter dated December 9, 2016 – subsequently issued its "Determination," stating:

> The investigation of the above-captioned complaint has determined that the Missouri Commission on Human Rights (MCHR) lacks jurisdiction over this matter because the complaint did not involve a category covered by the Missouri Human Rights Act.  Therefore, MCHR is administratively closing this case and terminating all MCHR proceedings relating to your complaint. If you are aggrieved by this decision, then you can appeal by filing a petition under § 536.150 of the Revised Statutes of Missouri in state circuit court. Any such petition must be filed in the circuit court of Cole County.

*See* Answer at ¶¶ 61, 82; Exhibit C to Answer.  Plaintiffs did not appeal the MCHR's determination, and they never obtained a Notice of Right to Sue from the MCHR.  *See* Answer at ¶¶ 61, 82, 83.

Subsequent to the MCHR's Determination, Plaintiffs' complaint in the remaining HUD matter was amended, adding claims of "discriminatory advertising, statements and notices" and

---

[1] Both of these types of claims can be collectively referred to as Plaintiffs' "sex discrimination" claims.  Although there are certainly distinctions between these two types of claims, they both require Plaintiffs to establish sex-based discriminatory conduct here.

"discriminatory terms, conditions, privileges, or services and facilities." *See* Answer at ¶ 62; Exhibit E to Answer.  HUD investigated Plaintiffs' amended complaint until June 2018, when Plaintiffs withdrew their amended complaint.  *See* Answer at ¶ 62; Exhibit F to Answer.  Neither the original nor amended complaint named FV Services as a respondent or otherwise mentioned or referenced FV Services.  *See* Answer at ¶¶ 60, 62; Exhibit B to Answer; Exhibit E to Answer.

On September 14, 2018, contemporaneously with the filing of their Motion and this Memorandum in Support, Defendants Friendship Village and FV Services filed their Answer to Plaintiffs' Complaint, responding to Plaintiffs' allegations and attaching as exhibits various relevant public records[2] pertaining to Plaintiffs' administrative complaint proceedings and the genesis of FV Services as an organization.

Even accepting Plaintiffs' allegations as true (for the limited purposes of this Motion),[3] the Complaint fails to state a cognizable claim for sex discrimination under the FHA.  But even if the Court determines that Plaintiffs have stated a claim for sex discrimination under the FHA, the pleadings in this matter clearly demonstrate that Plaintiffs' claims under the MHRA, as well as any claim against Defendant FV Services, must be dismissed.  There is no question that Plaintiff failed to exhaust administrative remedies by failing to appeal the MCHR's Determination and obtain a right-to-sue letter.  Additionally, regardless of the exhaustion issue, the Complaint on its face fails to state a claim against FV Services, which did not exist at the time of the alleged

---

[2] Specifically, Defendants' Answer references – and attaches as exhibits – the following documents:  FV Service's Articles of Incorporation (filed with the Missouri Secretary of State) (Exhibit A to Answer); October 2016 Notice and Complaint from the MCHR (Exhibit B to Answer); December 2016 MCHR Determination Letter (Exhibit C to Answer); December 2016 MCHR letter to HUD (Exhibit D to Answer); December 2016 Notice and Amended Complaint from HUD (Exhibit E to Answer); June 2018 Withdrawal Letter from HUD (Exhibit F to Answer).  As discussed more fully below, it is proper for the Court to consider these documents in ruling on this Motion.

[3] Defendants do not admit that Plaintiffs' operative allegations as true, but treat them hypothetically as true for purposes of the present Motion.

events forming the basis of Plaintiffs' claims.  For these reasons – and as discussed more fully below – Plaintiffs' claims must be dismissed.

## LEGAL STANDARD

A party is entitled to judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure if, after the pleadings have closed, the moving party establishes that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law. Fed.R.Civ.P. 12(c); *see also, e.g., United States v. Any and All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000); N*at'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 428 (8th Cir. 1993); *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  A Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard as a 12(b)(6) motion to dismiss.  *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012) (applying 12(b)(6) standard to motion for judgment on the pleadings); *Boswell v. Panera Bread Co*., 91 F. Supp. 3d 1141, 1144 (E.D. Mo. 2015).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  If a complaint pleads facts that are "merely consistent with a defendant's liability, it stops short of the line between possibility and probability of entitlement to relief."  *Id*. (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).  Although a reviewing court should accept all <u>well-plead</u> factual allegations in the complaint as true, *Neitzke v.*

*Williams*, 490 U.S. 319, 326 (1989), the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.  Fed. R. Civ. P. 8 "demands more than an unadorned, the defendant-unlawfully-harmed me accusation"; it "does not empower [a plaintiff] to plead the bare elements of his cause of action . . . and expect his complaint to survive." *Iqbal*, 556 U.S. at 678, 687.  Importantly, "[a] district court . . . is not required to divine the litigant's intent and create claims that are not clearly raised, and it need not conjure up unpled allegations to save a complaint." *Ginsburg v. InBev NV/SA*, 649 F.Supp.2d 943, 946 (E.D. Mo. 2009) (quoting *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009)).

"In considering a Rule 12(c) motion, the Court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Schnuck Markets, Inc. v. First Data Merchant Data Services Corp.*, 86 F.Supp.3d 1055, 1059 (E.D. Mo. 2015) (quoting *Nationwide Mut. Ins. Co. v. Harris Medical Associates, LLC*, 973 F.Supp.2d 1045, 1051 (E.D.Mo.2013) (citing *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir.1999))).  This includes "any facts of which the district court will take judicial notice." *Id.* (quoting *Unite Here Local 74 v. Pinnacle Entertainment, Inc.*, No. 4:10CV00747, 2011 WL 65934, at *2–3 (E.D. Mo. Jan. 10, 2011) (quoting 5C Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1367 (3d ed. 2010))).  Accordingly, it is proper for the Courts to consider the exhibits attached to Defendants' Answer in ruling on this Motion, as these documents are unquestionably part of the pleadings, embraced by the pleadings, public records, and/or otherwise entitled to judicial notice. *Fabisch v. University of Minnesota*, 304 F.3d 797, 802-03 (8th Cir. 2002) (in granting defendant's motion for judgment on the pleadings based on plaintiff's failure to exhaust administrative remedies, finding that EEOC

charge documentation is public record and that considering such does not convert a Rule 12(c) motion to a summary judgment motion).

## ARGUMENT

## I.    PLAINTIFFS FAIL TO STATE A CLAIM FOR SEX DISCRIMINATION UNDER THE FAIR HOUSING ACT

### A.    *The Complaint Clearly Outlines Plaintiffs' Legal Theories*

Plaintiffs' Complaint – filled with detailed legal conclusions – demonstrates that sexual orientation lies at the heart of their purported sex discrimination claims and that Plaintiffs seek to expand the scope of the FHA's prohibition of "sex"-based discrimination.  Various portions of the Complaint make this clear.  For instance:

- Paragraph 32:  "Ms. Walsh and Ms. Nance are lesbians. That is, they are women whose primary emotional, romantic, and sexual attractions are to other women. On July 30, 2009, Ms. Walsh and Ms. Nance legally married in Massachusetts."

- Paragraph 52:  "Ms. Walsh and Ms. Nance could not believe that in 2016, as a married couple, they would experience such open discrimination in their community. Earlier in their careers, Ms. Walsh and Ms. Nance had been afraid to reveal their sexual orientation at work, because they were worried they would lose their jobs. But after retiring and getting legally married, they thought they were living in a new time of increased acceptance."

- Paragraph 68:  "Plaintiffs were further subjected to this discrimination because they are women who do not conform to traditional sex stereotypes, including that a married woman should be in a different-sex relationship; that a married woman's spouse should be a man; and that women should be attracted to and form relationships with men, not women."

*See* Complaint at ¶¶ 32, 52, 68.  Several other paragraphs in the Complaint – despite attempting to mask the issue as one of sex discrimination – similarly reinforce the theme of sexual orientation – for instance, by relying on the existence of Plaintiffs' homosexual relationship.  *See* Complaint at ¶¶ 17, 67, 70, 76, 78, 85, 87.  Given the level of detail in these paragraphs, it is

clear what legal theories Plaintiffs' are attempting to utilize in support of their claims, and each of those theories are directly rooted in Plaintiffs' sexual orientation.

In essence, Plaintiffs' legal theories – as outlined in the aforementioned Complaint passages – can be characterized in three ways.  First, and as discussed immediately below, to the extent Plaintiffs are seeking to convince the Court that they have alleged straightforward sex discrimination, Plaintiffs are arguing that discrimination based on their sexual orientation is necessarily discrimination on the basis of sex.  Second, and derivative of the first type of argument, to the extent Plaintiffs both emphasize the sex of their spouse (each other), Plaintiffs are arguing that receiving less favorable treatment because of their association with a person of a particular sex constitutes sex discrimination (i.e., the "associational" theory).  *See, e.g.,* Complaint at ¶¶ 17, 67, 70, 76, 78, 85, 87.  Third, Plaintiffs argue that discrimination based on their sexual orientation constitutes unlawful discrimination on the basis of non-conformity with sex stereotypes.  *See, e.g.,* Complaint at ¶¶ 68, 76, 78, 85, 87.  None of these legal theories support a claim of sex discrimination under the FHA.

Defendants emphasize that Plaintiffs are not alleging a traditional theory of sex discrimination.  One of the basic inquiries for disparate treatment sex discrimination claims (when brought by females) is whether similarly-situated men were or are treated more favorably. *See Jones v. Frank*, 973 F.2d 673, 676-77 (8th Cir. 1992) ("[The plaintiff's] claim of unlawful disparate treatment must rest on proof that she and the three men are 'similarly situated in all relevant respects.'") (quoting *Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir.1988)); *Roach v. Vallen Safety Supply Co.*, 14 Fed. App'x 711, 712 (8th Cir. 2001) (concluding that the plaintiff's disparate treatment claim failed due to the lack of evidence that similarly-situated males were treated more favorably); *Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1034-35 (8th Cir.

2016) (finding the plaintiff's sex discrimination claim to be precluded where the defendant had not treated males less favorably than similarly-situated females).[4]   Plaintiffs' Complaint, however, does not allege that similarly-situated[5] males would be treated more favorably under Friendship Village's alleged policy.   Indeed, Plaintiffs are alleging that male same-sex couples would be denied by Friendship Village as well because, on the face of the Complaint, Friendship Village's alleged policy would apply equally to male same-sex couples.   Thus, as much as Plaintiffs would like the Court to think that their Complaint invokes a straightforward application of basic sex discrimination principles, that is simply not the case here.   Rather, and as demonstrated by the above-identified Complaint paragraphs repeatedly underscoring Plaintiffs' homosexual status, Plaintiffs' claims are based on legal theories that would require the Court to provide FHA protections to Plaintiffs on the basis of their sexual orientation.   But – as discussed more fully below – sexual orientation is not a protected category under the FHA.   *See infra*.

### B.   *Plaintiffs' Legal Theories Do Not Support Their Sex Discrimination Claims*

Plaintiffs fail to state a claim for sex discrimination under the FHA because none of the aforementioned legal theories can be used to establish a cognizable sex discrimination claim.

### 1.   This Court Rejected Plaintiffs' Legal Theories in its *Horton* Decision

Based on long-standing Eighth Circuit precedent, this Court has already – and recently – rejected the types of sex discrimination theories espoused by Plaintiff.   *See Horton v. Midwest Geriatric Management, LLC*, No. 4:17CV2324 JCH, 2017 WL 6536576 (E.D. Mo. Dec. 21,

---

[4] Although these cited cases involved claims of employment discrimination, Defendants emphasize that Title VII principles and context are directly analogous and applicable to this Court's analysis of the FHA.  For this reason, federal courts have consistently applied Title VII principles and analysis in the FHA context.  *See* Section B.1., Note 8, pp.10-11.

[5] Given that comparators must be similarly-situated in all relevant aspects, "similarly-situated" in this case must necessarily mean individuals in a same-sex relationship and marriage seeking to share a single unit at Friendship Village.

2017).   In the *Horton* case, in the analogous Title VII context, the plaintiff alleged that the defendant "unlawfully discriminated against him on the basis of sex when it withdrew its offer of employment after learning of Plaintiff's homosexual relationship."  *Id.* at *3.[6]  In support of his claim, the plaintiff invoked the same three theories utilized by Plaintiffs here.  *See id.*  In granting the defendant's motion to dismiss for failure to state a claim, this Court rejected each of these legal theories.  *Id.* at *3-4.

In rejecting the first theory, this Court noted that "[s]exual orientation . . . is not explicitly a protected characteristic under Title VII" and emphasized the existence of a number of failed proposed statutory amendments that would have made sexual orientation a protected class.  *Id.* at *3.[7]  This Court also relied on *Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69 (8th Cir. 1989), in which the Eighth Circuit "squarely held" that "Title VII does not prohibit discrimination against homosexuals."  *Horton*, 2017 WL 6536576 at *3 (quoting *Williamson*, 876 F.2d at 70).  The Court then swiftly rejected the second theory – the "associational" argument – pointing again to *Williamson*.  *Id.* at *4.

In rejecting the third legal theory – non-conformity with sex stereotypes – this Court noted that sex stereotyping "can violate Title VII" under certain circumstances.  *Id.*  But the Court refused to adopt a broad view of "sex stereotyping" claims, noting that "[c]ourts have routinely rejected attempts to use a sex-stereotyping theory to bring . . . what is in essence a claim for discrimination on the basis of sexual orientation."  *Id.* (brackets in original) (quoting

---

[6] Defendants emphasize that this is essentially the same allegations made by Plaintiffs here, but in the housing arena.

[7] As discussed below, the same is true in this case.  Sexual orientation is not explicitly included in the FHA's list of protected classes, and Congress has rejected a number of proposed amendments to the FHA that would have prohibited discrimination on the basis of sexual orientation.

*Pambianchi v. Arkansas Tech University*, No. 4:13CV46 KGB, 2014 WL 11498236, at *4 (E.D.

Ark. Mar. 14, 2014).  The Court further stated:

> In order to determine whether a plaintiff has stated a claim for discrimination,
> "most courts generally attempt to distinguish between discrimination based on
> stereotypical notions of femininity and masculinity and that based on sexual
> orientation, determining the former is actionable . . . while the latter is not." . . .
> Courts have acknowledged the difficulty in drawing a line between sex
> stereotypes and notions of heterosexuality and homosexuality.   Nevertheless,
> most courts determine the distinction is necessary to adhere to binding precedent
> that sexual orientation is not a protected characteristic[.]

*Id.* (quoting *Pambianchi*, 2014 WL 11498236, at *5).

Ultimately, the Court determined that the plaintiff's sex-stereotyping claim was non-

actionable because it was directly derived from his sexual orientation.  *Id.* ("Sexual orientation

alone cannot be the alleged gender non-conforming behavior that gives rise to an actionable . . .

claim under a sex-stereotyping theory[.]") (quoting *Pambianchi*, 2014 WL 11498236, at *5).

As discussed more fully below, the same conclusions made by the Court in the *Horton*

decision – and by the Eighth Circuit in *Williamson* – should be utilized here and, thus, result in

the dismissal of Plaintiffs' FHA sex discrimination claims.  *See Wetzel v. Glen St. Andrew Living*

*Community, LLC*, No. 17-1322, 2018 WL 4057365, at *3, --- F.3d --- (7th Cir. Aug. 27, 2018)

(finding that court's prior Title VII sex discrimination ruling in *Hively v. Ivy Tech Community*

*College of Indiana*, 853 F.3d 339 (7th Cir. 2017) – regarding sexual orientation and the scope of

"sex discrimination" under Title VII – to "appl[y] with equal force under the FHA").[8]

---

[8] Defendants emphasize that in addition to the *Wetzel* decision, other federal courts' treatment of
Title VII and the FHA support the use and application of Title VII principles and analysis in the
analogous FHA context. *See Thomas v. Osegueda*, No. 2:15–CV–0042–WMA, 2015 WL
3751994, *4 and n.1 (N.D. Ala. June 16, 2015) (discussing case law from "the analogous context
of Title VII" in evaluating sex-stereotyping claims) ("Most courts applying the FHA . . . have
analogized it to Title VII of the Civil Rights Act of 1964 . . . , which prohibits discrimination in
employment." (citing *Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th
Cir.1996)).  Notably, the same disparate treatment claim analysis and [continued on next page]

## 2.        The Fair Housing Act Does Not Provide the Protections Sought by Plaintiffs

As with Title VII, sexual orientation is not a protected characteristic under the Fair Housing Act.  Textually, the FHA provides that "it shall be unlawful" – *inter alia* – "[t]o  refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin"; or "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination."   42 U.S.C.  §  3604(a), (c).   Accordingly, sexual orientation is not expressly protected under the FHA.

---

framework is used in both Title VII and FHA cases.  *See, e.g., Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010); *Willis v. Morgan*, No. 4:15CV00037 SNLJ, 2016 WL 3458158, *2 (E.D. Mo. June 24, 2016); *Metropolitan St. Louis Equal Housing and Opportunity Council v. City of Maplewood, Missouri*, No. 4:17CV886 RLW, 2017 WL 6278882, *3 (E.D. Mo. Dec. 8, 2017).  In *Young v. Hagar-Mace*, the Western District of Missouri looked to Title VII case law in evaluating an appointment of counsel issue under the FHA, given the similarities between the two statutes.  No. 4:16–CV–00969–DGK, 2017 WL 2729103, *2 (W.D. Mo. June 23, 2017).  In *Badami v. Flood*, the Eighth Circuit applied a Supreme Court decision on Title VII punitive damages to the FHA, noting that the same punitive damages standard applied under both statutes. 214 F.3d 994, 997 (8th Cir. 2000).  In *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, the Supreme Court discussed thoroughly and relied heavily on Title VII in principles in finding that the FHA permitted disparate impact claims.  135 S.Ct. 2507 (2015) (noting that it was "necessary to consider" Title VII – a "relevant statute" – before turning to the FHA) ("Applied here, the logic of [Title VII case law] and [ADEA case law] provides strong support for the conclusion that the FHA encompasses disparate-impact claims."). In doing so, the Supreme Court highlighted the statutes' "similarity in text and structure" and found Title VII applicable despite the fact the FHA did not have identical prohibitive language. *Id.* at 2519 ("Congress thus chose words that serve the same purpose and bear the same basic meaning [as Title VII] but are consistent with the structure and objectives of the FHA."). Indeed, the Court noted that the statutes had the same "central purpose."  *Id.* at 2521 ("The FHA, like Title VII and the ADEA, was enacted to eradicate discriminatory practices within a sector of our Nation's economy.").  Accordingly, Defendants' emphasis on this Court's – and the Eighth Circuit's – Title VII case law is warranted, given the inherent relevance.

Further, numerous courts have agreed that sexual orientation is not covered by the statute. *See, e.g., Smith v. Mission Associates Ltd. Partnership*, 225 F.Supp.2d 1293, 1299 (D. Kansas 2002) ("Sexual orientation claims are not actionable under the FHA[.]"); *Thomas v. Wright*, No. 2:14–cv–01604–RDP, 2014 WL 6983302, *3 (N.D. Ala. Dec. 10, 2014) ("The FHA does not prohibit discrimination based on sexual orientation in the sale or rental of housing."); *Ordelli v. Mark Farrell & Associates*, No. 3:12–cv–1791–SI, 2013 WL 1100811, *2 (D. Oregon March 15, 2013) ("While Oregon state law prohibits discrimination based on sexual orientation in the sale or rental of housing, . . . the FHA does not."); *Miller v. 270 Empire Realty LLC*, No. 09–CV–2857 (RJD)(RER), 2012 WL 1933798, *5 (E.D. N.Y. April 6, 2012) ("Whether [the defendant] knew of [the plaintiff's] sexual orientation is irrelevant because [the plaintiff's] FHA claims are not, nor could they be, based on [the plaintiff's] sexual orientation."); *Swinton v. Fazekas*, No. 06-CV-6139T, 2008 WL 723914, *5 (W.D. N.Y. March 14, 2008) ("Discrimination based on sexual orientation is not covered under the Federal Housing Act[.]"); *Fair Housing Center of Washtenaw County, Inc. v. Town and Country Apartments*, No. 07–10262, 2009 WL 497402, *3, n. 1 (E.D. Mich. Feb. 26, 2009) ("Sexual orientation is not protected under the FHA."). Furthermore, Congress has rejected several proposed amendments to the FHA that would have prohibited housing discrimination on the basis of sexual orientation.  Since 2009, there have been at least seven such legislative efforts in Congress, all of which were rejected.  *See, e.g.,* Fair and Equal Housing Act of 2017, S. 1328, 115th Cong. (2017-2018); Fair and Equal Housing Act of 2017, H.R. 1447, 115th Cong. (2017-2018); HOME Act of 2013, S. 1242, 113th Cong. (2013-2014); HOME Act of 2013, H.R. 2479, 113th Cong. (2013-2014); HOME Act of 2011, S. 1605, 112th Cong. (2011-2012); HOME Act of 2011, H.R. 3030, 112th Cong. (2011-2012); Fair and Inclusive Housing Rights Act of 2010, H.R. 4820, 111th Cong. (2009-2010).

These attempts to amend the FHA have always failed. But Plaintiffs, represented by two special interest groups, are now attempting to achieve through this action what Congress has consistently and without exception declined to do – create a protected category in the FHA for sexual orientation.

Finally, to the extent the FHA recognizes sex-stereotyping claims,[9] this type of claim has been applied very narrowly, similar to this Court's narrow view of sex-stereotyping claims in the *Horton* case. *See Osegueda*, 2015 WL 3751994, at *3-4 (noting that relief under an FHA sex-stereotyping claim would be "narrowly limited" and that "expanding such protections further would require action by Congress").  Specifically, a sex-stereotyping claim under the FHA must be "directly rooted in non-conformity with male or female gender stereotypes, *and not* directly derivative of sexual orientation as an independent and separate ground for protection."  *Id.* at *3 (emphasis added).

### 3.    Plaintiffs' Theories are Insufficient to Support Their Sex Discrimination Claims

Taking into account all of the above-cited authority, Plaintiffs have failed to state a claim under the FHA because their legal theories do not support a claim for sex discrimination.  Again, as demonstrated by the above-referenced portions of the Complaint, Plaintiffs' sex discrimination claims – no matter how Plaintiffs characterize them – rely exclusively on factors and considerations stemming from their sexual orientation.

First, to the extent Plaintiffs rely on their argument that Friendship Village's alleged consideration of Plaintiffs' homosexual relationship necessarily equates to discrimination based on sex, the statutory text/legislative history and case law clearly point to the opposite conclusion.

---

[9] Neither this Court nor the Eighth Circuit has ruled on this issue.  Defendants do not concede that sex-stereotyping claims are actionable, but merely assume they are available for the purposes of their Motion.

As noted above, sexual orientation is not explicitly a protected characteristic under the FHA.  *See Horton*, 2017 WL 6536576, at *3.  Furthermore, Congress has rejected a number of proposed amendments to the FHA to prohibit discrimination on the basis of sexual orientation.  *See id.*  Moreover, numerous federal district courts have found that sexual orientation-based claims are not actionable under the FHA.  *See Smith*, 225 F.Supp.2d at 1299; *Wright*, 2014 WL 6983302, at *3; *Ordelli*, 2013 WL 1100811, at *2; *Miller*, 2012 WL 1933798, at *5; *Swinton*, 2008 WL 723914, at *5; *Town and Country Apartments*, 2009 WL 497402, at *3, n. 1.  Additionally, clear precedent from this Court and the Eighth Circuit – finding sexual orientation claims precluded in the analogous Title VII context – strengthen the case for similar treatment of sexual orientation-based claims in the FHA arena.  *See Horton*, 2017 WL 6536576, at *3-4; *Williamson*, 876 F.2d at 70.  *See also Wetzel*, 2018 WL 4057365, at *3 (applying that court's prior ruling on the scope Title VII sex discrimination "with equal force" to the FHA context).

For the same reasons, Plaintiffs' claims can also be dismissed to the extent they rely on the related argument that receiving less favorable treatment based on their association with a person of a particular sex constitutes sex discrimination.  *See Horton*, 2017 WL 6536576, at *3-4 (summarily rejecting the plaintiff's "associational" sex discrimination argument on the same bases as the Court's rejection of the plaintiff's first argument).  As in *Horton*, there is no basis here for expanding the civil rights statutes' understanding of sex discrimination to allow for this type of theory, especially given the clear legal authority indicating that sexual orientation discrimination is not prohibited.

Finally, even if sex-stereotyping claims are actionable under the FHA, that is not fatal to Defendants' Motion.  Even if such claims are available, Plaintiffs have failed to sufficiently

allege such a claim, for their sex-stereotyping theory is too broad.  In each instance, Plaintiffs derive their sex-stereotyping claims directly from their sexual orientation.

In *Horton*, this Court noted that regardless of where the line may be on this issue, sex-stereotyping claims are not actionable if they are simply derived from or based on the plaintiff's sexual orientation.  And again, the FHA has been interpreted in a similarly-narrow way.  *See Osegueda*, 2015 WL 3751994, at *3-4 (noting that an FHA sex-stereotyping claim may not be "directly derivative of sexual orientation as an independent and separate ground for protection").  Here, in characterizing Plaintiffs' sex-stereotyping claims, the Complaint identifies the following "traditional" sex-based stereotypes to which Plaintiffs purportedly did not conform (and on which Friendship Village is alleged to have impermissibly relied):   "that a married woman should be in a different-sex relationship; that a married woman's spouse should be a man; and that women should be attracted to and form relationships with men, not women."  *See* Complaint at ¶¶ 68, 76, 85, 87.  On their face, each of these "stereotypes" is directly derivative of Plaintiffs' sexual orientation, having nothing to do with any personal characteristics of Plaintiffs relative to stereotypical norms on appearance, demeanor, and the like.  Allowing a claim to move forward on such a broad theory of sex stereotyping would functionally make sexual orientation an "independent and separate ground for protection" because the theory would apply to and provide protection for each and every homosexual individual based on their homosexuality, since homosexual individuals – as a general matter – do not conform to the purported "stereotypes" identified by Plaintiffs.   Accordingly, Plaintiffs' sex-stereotype claims are non-actionable because they go beyond permissible stereotype theory.  *See Horton*, 2017 WL 6536576, at *4 (noting that a sex-stereotyping claim "should not be used to bootstrap protection for sexual orientation into Title VII").

15

For all these reasons, Plaintiffs do not invoke an actionable theory of sex discrimination, and thus, Plaintiff's Complaint fails to state a claim for sex discrimination under the FHA. Accordingly, Defendants request that Plaintiffs' FHA claims be dismissed with prejudice.

Further, to the extent the Court does not grant Defendants' Motion as it relates to the exhaustion of Plaintiffs' MHRA claims (as discussed below), the Court should still dismiss Plaintiffs' state law claims due to the loss of supplemental jurisdiction from the dismissal of the FHA claims. *Robbins v. Becker*, No. 4:10CV1552 HEA, 2014 WL 222781, *5 (E.D. Mo. Jan. 21, 2014) (declining to exercise jurisdiction over the plaintiff's state-law claims after the dismissal of federal claims) (noting that the factors of judicial economy, convenience, fairness, and comity "generally weigh in favor of declining to exercise jurisdiction") (collecting cases).

## II.    PLAINTIFFS HAVE FAILED TO EXHAUST ADMINISTRATIVE REMEDIES FOR THEIR MHRA CLAIMS – OR THEIR CLAIMS AGAINST FV SERVICES – AND ARE UNABLE TO EXHAUST THEM NOW

Even if the Court finds that Plaintiffs have stated a claim for sex discrimination under the FHA, the Court should still dismiss Plaintiffs' MHRA claims for failure to exhaust administrative remedies.

The pleadings as a whole demonstrate that Plaintiffs did not exhaust administrative remedies before bringing their MHRA claims, and are unable to do so now.  Specifically, Plaintiffs failed to appeal the MCHR's determination on their administrative complaint to the Cole County Circuit Court, as required by the MCHR and by statute. Furthermore, Plaintiffs never obtained a right-to-sue letter from the MCHR, and they are precluded from seeking one now because they failed to appeal the MCHR's determination. In addition, Plaintiffs did not exhaust any type of discriminatory notice/statement claim in the MCHR proceeding or any type of claim against FV Services.

Most importantly, the MCHR rendered a final determination which Plaintiffs failed to appeal. Any person aggrieved by the MCHR's final decision, finding, or order – including the agency's failure to provide a right-to-sue letter – may only contest those findings and obtain review of that decision by filing a petition in state circuit court within 30 days, in the manner provided by Mo. Rev. Stat. § 536.150.  Mo. Rev. Stat. § 213.085.2-.3; *King v. Conti Elec., Inc.*, No. 4:05-cv-1552, 2006 WL 1153800, *1 (E.D. Mo. 2006); *see also* Answer at ¶¶ 61, 82; Exhibit C to Answer.  Here, Plaintiffs did not appeal the MCHR's determination and, thus, failed to follow the required procedure.  The MCHR determined that it "lacks jurisdiction over this matter because the complaint did not involve a category covered by the Missouri Human Rights Act." *See* Answer at ¶¶ 61, 82; Exhibit C to Answer. The MCHR's determination letter informed Plaintiffs of their right to appeal the determination "by filing a petition under § 536.150 of the Revised Statutes of Missouri in state Circuit Court. Any such petition must be filed in the circuit court of Cole County." *Id.*  But Plaintiffs failed to file any petition seeking review of the MCHR's determination and, therefore, failed to exhaust their administrative remedies under the MHRA.

Plaintiffs also failed to obtain a statutorily-required right-to-sue letter.  Claims brought under the MHRA shall be filed within ninety days from the date of the MCHR's "right-to-sue" letter (notifying a person of their right to bring a civil action) to the allegedly-aggrieved individual.  *Clayton v. Speed Emissions, Inc.*, No. 4:12-CV-565, 2012 WL 1253066, *2 (E.D. Mo. April 13, 2012) (quoting Mo. Rev. Stat. § 213.111.1).  It is well-settled that "a right-to-sue letter is a prerequisite to the filing of a MHRA claim in . . . court." *Id.*  (quoting *Davis v. Bemiston–Carondelet Corp.*, 4:05-CV-941-DDN, 2006 WL 1722277, at *3 (E.D. Mo. June 20, 2006) (quoting *Public School Retirement System of the School Dist. of Kansas City v. Missouri*

*Commission on Human Rights*, 188 S.W.3d 35, 44 (Mo. Ct. App. 2006))); *see also Whitmore v. O'Connor Management, Inc.*, 156 F.3d 796, 800–01 (8th Cir. 1998); *Simmons v. Directory Distributing Associates*, No. 4:04-CV-674, 2005 WL 2033426, *6 (E.D. Mo. Aug. 22, 2005); *Michal v. D.H. Pace Company, Inc.*, No. 4:18-CV-341, 2018 WL 3020292, *2 (E.D. Mo. June 18, 2018); *King*, 2006 WL 1153800, at *1.[10]

The pleadings in this matter makes clear that Plaintiffs have not obtained a right-to-sue letter and, in fact, have missed their opportunity to seek one.  As an initial matter, Plaintiffs freely admit in their Complaint that they have not received a right-to-sue letter from the MCHR *See* Complaint at ¶ 83.  The pleadings and related public records further demonstrate that:  (1) the MCHR issued its determination in a letter dated December 9, 2016, finding that it lacked jurisdiction over the matter and – accordingly – not issuing a right-to-sue letter; and (2) Plaintiffs did not appeal the MCHR's determination within 30 days, as required by the MHRA.  *See* Answer at ¶¶ 61, 82; Exhibit C to Answer.  The MCHR decided not to issue a right-to-sue letter when it administratively closed Plaintiffs case and terminated all proceedings related thereto, and Plaintiffs missed their only opportunity to challenge that decision.  Put simply, Plaintiffs do not have a right-to-sue letter, and they have no way to obtain one because they failed to appeal the MCHR's determination.[11]

Because Plaintiffs have not and cannot satisfy this condition precedent, they have not exhausted, and are unable to exhaust, administrative remedies under the MHRA.  Accordingly,

---

[10] Although these MHRA cases involve alleged employment discrimination, rather than housing discrimination, Defendants emphasize that the relevant MHRA provisions relating to the issuance of right-to-sue letters and the appeal of MCHR determinations apply to both housing and employment cases.  *See* Mo. Rev. Stat. §§ 213.111, 213.085.

[11] This is not at all inconsistent with Plaintiffs' Complaint, wherein Plaintiffs never allege that they have exhausted administrative remedies under the MHRA, nor plead facts that would constitute such exhaustion.

dismissal of Plaintiffs' MHRA claims is appropriate.  *See Whitmore v. O'Connor Management, Inc.*, 156 F.3d 796, 800–01 (8th Cir.1998); *Simmons v. Directory Distributing Associates*, No. 4:04-CV-674, 2005 WL 2033426, *6 (E.D. Mo. Aug. 22, 2005); *Michal v. D.H. Pace Company, Inc.*, No. 4:18-CV-341, 2018 WL 3020292, *2 (E.D. Mo. June 18, 2018).[12]

Finally, wholly separate from the issue of Plaintiffs' failure to obtain a right-to-sue letter is Plaintiffs' failure to exhaust:  (1) any sort of discriminatory notice/statement claim in the MCHR proceeding; and (2) any type of claim against FV Services.  As to (1), the administrative proceeding documentation – on its face – reflects that the only type of allegation in Plaintiffs' original complaint was "discriminatory refusal to rent" and that Plaintiffs' HUD complaint was only amended (to include a claim for discriminatory statements/notices) subsequent to MCHR issuing its Determination and "terminating all MCHR proceedings related to [Plaintiffs'] Complaint."  *See* Answer at ¶¶ 60-62, 82; Exhibit B to Answer; Exhibit C to Answer; Exhibit E to Answer.  The amended complaint was never part of the MCHR proceeding, so Plaintiffs could not have even arguably exhausted anything under the MHRA other than a claim for "discriminatory refusal to rent."  Regarding (2), Plaintiffs' administrative complaints (original and amended) neither named FV Services as a respondent nor even mentioned FV Services at all.  *See* Answer at ¶¶ 60, 62; Exhibit B to Answer; Exhibit E to Answer.  Accordingly, Plaintiffs cannot have exhausted any MHRA claims against FV Services.

---

[12] Defendants acknowledge that some of the cited case law indicates the possibility of curing this type of defect (failure to obtain a right-to-sue letter) after a lawsuit has been initiated.  However, for the reasons discussed above, Plaintiffs are unable to cure this defect because – after Plaintiffs failed to appeal the MCHR's determination that it lacked jurisdiction over the matter – the MCHR lacks the authority to issue a right-to-sue letter.  Again, all MCHR proceedings related to Plaintiffs' complaint have been terminated.  *See* Answer at ¶¶ 62, 82; Exhibit C to Answer.

For all these reasons, the pleadings demonstrate that Plaintiffs failed to exhaust any MHRA claims – and any claims against FV Services – prior to filing this lawsuit, and those claims must be dismissed.

## III.   PLAINTIFFS FAILED TO STATE ANY CLAIMS AGAINST DEFENDANT FV SERVICES

Even if the Court finds that Plaintiffs have stated a claim for sex discrimination under the FHA, and also denies Defendants' request to dismiss the MHRA claims as discussed above (which Defendants respectfully state the Court should not do), the Court should still dismiss all claims against Defendant FV Services.

Plaintiffs' Complaint does not allege facts sufficient to support any of Plaintiffs' claims against Defendant FV Services.   This failure makes sense, given that – as the pleadings demonstrate – FV Services did not exist until long after the alleged events forming the basis of Plaintiffs' claims.

As an initial matter, FV Services is only specifically mentioned in four paragraphs of the Complaint, none of which contain allegations connecting FV Services to the relevant alleged events.[13]  These paragraphs merely allege:

- Paragraph 5:  "FV Services, Inc., the parent company and sole member of Friendship Village, manages the Friendship Village community and another affiliated community in St. Louis County, Friendship Village Chesterfield."

- Paragraph 6:  "Neither Friendship Village nor FV Services, Inc. is affiliated with any religion or operated by any religious institution or order. Friendship Village is open to the public and does not inquire about the religious beliefs or affiliations of residents."

---

[13] Although certain paragraphs in the Complaint use the term "Defendants," this collective term is only used in making conclusory statements devoid of specific allegations of specific facts or events.

- Paragraph 27:  "[Defendant Friendship Village] is currently controlled and managed by Defendant FV Services, Inc. [Defendant Friendship Village] is affiliated with another, separately incorporated senior living community in St. Louis County, Friendship Village of West County d/b/a Friendship Village Chesterfield, which is also controlled and managed by Defendant FV Services, Inc."

- Paragraph 28:  "Defendant FV Services, Inc. is a Missouri nonprofit corporation with its principal place of business in St. Louis County, Missouri. FV Services, Inc. is the parent company and sole member of Defendant Friendship Village, and controls and manages Friendship Village. It is also the parent company and sole member of another senior living community, Friendship Village of West County, d/b/a Friendship Village Chesterfield."

Complaint at ¶¶ 5-6, 27-28.  In essence, the only thing Plaintiffs specifically allege about Defendant FV Services is that they _currently_ "control," "manage," and act as the "parent company" and "sole member" of Defendant Friendship Village and another "affiliated" community.

Notably, and perhaps intentionally, nowhere in the Complaint do Plaintiffs allege that FV Services controlled or managed or was organizationally related to Defendant Friendship Village during the relevant time frame.[14]  The above-listed allegations on these topics only relate to the "current" status of these entities.  Plaintiffs make no allegations concerning when FV Services began managing or controlling Friendship Village, or when it became the "parent company" or "sole member" of Friendship Village.  Conversely, the Complaint specifically claims that "Friendship Village was managed by Life Care Services, LLC" "[u]ntil February 28, 2017."

---

[14] The alleged discrimination took place in 2016.

Complaint at ¶ 13.  The alleged discriminatory conduct and other related purported events allegedly took place in the spring and summer of 2016.  Complaint at ¶¶ 1, 2, 8, 9, 10, 11, 14, 15, 39, 44, 45, 46, 49, 50, 53, 54, 64, 79, 80, 88, 89.

Similarly, nowhere in the Complaint do Plaintiffs allege specific facts that – if true – would show that FV Services took part in any of the specific acts, omissions, conversations, or documents around which Plaintiffs' claims revolve.  Rather, all of the Complaint's allegations concerning specific allegedly-discriminatory conduct (i.e., refusal to sell/rent and discriminatory notices/statements) specifically identify Defendant Friendship Village (and them alone) as the relevant actor.[15]  For example:

- The Complaint repeatedly makes specific reference to "Friendship Village" discriminating against Plaintiffs and/or denying them admission or Plaintiffs being told that "Friendship Village" would not accept them.  Complaint at ¶¶ 1, 2, 10, 50, 67, 80, 89.

- In identifying/describing specific individuals with whom Plaintiffs spoke, and in alleging specific statements that were made to Plaintiffs by those individuals, the Complaint only references Friendship Village.  Complaint at ¶¶ 8, 10, 11, 39, 44, 53, 80, 89.

- The Complaint's references to the Cohabitation Policy clearly describe it as Friendship Village's Policy, "set by Friendship Village's board of directors."  Complaint at ¶¶ 53, 54.

- Each allegation concerning Life Care Services purportedly communicating disapproval of the Cohabitation Policy specifically identifies Friendship Village and "the Board of

---

[15] As evidenced by its very first paragraph, the Complaint specifically indicates that references to "Friendship Village" are intended to mean Defendant Friendship Village Sunset Hills, which is also referred to as "Friendship Village or "Defendant Friendship Village" in this Memorandum.  *See* Complaint at ¶ 1.

Directors of Friendship Village" as the recipients of those communications.  Complaint at ¶¶ 13, 15, 63, 64.

- The Complaint specifically alleges that Friendship Village "actively recruited" and "encouraged" Plaintiffs, sending brochures and other promotional materials.  Complaint at ¶¶ 42, 71.

- The Complaint identifies Friendship Village as the party to whom Plaintiffs' deposit check was written, and it was Friendship Village's interim executive director who Plaintiffs alleged would have signed the wait list agreement.  Complaint at ¶¶ 45, 46.

- The Complaint specifically points out that the July 29, 2016 letter from Mike Heselbarth appeared on "the letterhead of Friendship Village Sunset Hills" and referred to the Cohabitation Policy as "the long-standing policy of Friendship Village Sunset Hills." The Complaint also alleges that Friendship Village drafted the letter and that Friendship Village directed Mike Heselbarth to issue it.  Complaint at ¶¶ 14, 54.

- The Complaint indicates that Plaintiffs only filed their HUD complaint against Friendship Village,[16] and Plaintiffs' allegations concerning HUD's investigatory findings relate only to what the investigation purportedly "revealed" about Friendship Village.  Complaint at ¶¶ 60, 63, 65.

- Plaintiffs' two exhibits attached to the Complaint – the July 29, 2016 letter and the Cohabitation Policy – both on their face relate to Friendship Village specifically.

In other words, the only defendant against whom substantive factual allegations have been made relating to alleged discrimination is Defendant Friendship Village.

---

[16] As noted above, Plaintiffs' administrative complaint did not name FV Services as a respondent or otherwise reference FV Services.

Finally, and on a more basic level, nothing in the Complaint alleges or even suggests that FV Services existed during the relevant time period.  Plaintiffs make no allegations concerning how long FV Services has existed, but the pleadings as a whole demonstrate that FV Services did not come into existence until the spring of 2017, long after the allegedly discriminatory acts alleged in the Complaint.  *See* Answer at ¶¶ 5, 27; Exhibit A to Answer.

In sum, the Complaint lacks any allegation connecting Defendant FV Services to the events that form the basis of Plaintiffs' claims.  The Complaint simply alleges that FV Services *now*, *currently* controls and manages Friendship Village.  But that is not enough to state a claim against FV Services for alleged 2016 events.  Further, Plaintiffs in no way allege liability based on any sort of successor-in-interest relationship.  Rather, they merely allege that the defendant entities are liable through agency principles.  Complaint at ¶¶ 29, 30, 66, 70, 72, 79, 80, 88, 89.  But the pleadings establish that FV Services was formed long after the relevant time period; its agents could not have rendered it liable for events in 2016 because it did not have agents in 2016.

For all these reasons, Plaintiffs have failed to state any claim against Defendant FV Services, and all of Plaintiffs' claims in the Complaint directed to FV Services must be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiffs have failed to state a claim for sex discrimination under the FHA; Plaintiffs have failed to exhaust their MHRA claims, or any claims against FV Services; and Plaintiffs have failed to state any claim against Defendant FV Services.  Judgment on the pleadings for each of Plaintiffs' claims is appropriate, and the claims should be dismissed with prejudice.  Accordingly, Defendants respectfully request that the Court grant its Motion for Judgment on the Pleadings in its entirety and dismiss these claims with prejudice.

Respectfully submitted,

**HUSCH BLACKWELL LLP**

By: */s/ Brad Hiles*
    Brad Hiles, #28907MO
    Brian Stair, #67370MO
    190 Carondelet Plaza, Suite 600
    St. Louis, MO  63105
    Phone: 314-480-1500
    Fax: 314-480-1505
    brad.hiles@huschblackwell.com
    brian.stair@huschblackwell.com

    *Attorneys for Defendants*


## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the foregoing was filed with the Court via the Court's CM/ECF System and thus served upon all parties of record this 14th day of September, 2018.


*/s/ Brad Hiles*